**J. R. ADAMS and G. R. Russell, Appellants,**

v.

**The AMERICAN QUARTER HORSE ASSOCIATION, Appellee.**

No. 8979.

Court of Civil Appeals of Texas, Amarillo.

May 29, 1979.

Second Rehearing Denied July 18, 1979.

Culton, Morgan, Britain & White, W. H. Brian, Amarillo, Richard E. Hancock, Lexington, Ky., for appellants.

Underwood, Wilson, Sutton, Berry, Stein & Johnson, R. A. Wilson, Amarillo, for appellee.

REYNOLDS, Chief Justice.

J. R. Adams and G. R. Russell appeal from a take-nothing judgment in their action for a mandatory injunction compelling The American Quarter Horse Association to register their filly. The central questions are whether the trial court did, and we hold that the court did not, reversibly err in failing to determine that AQHA procedurally denied due process to, and unfairly discriminated against, Adams and Russell in denying registration of their filly. Affirmed.

Appellants Adams and Russell, both members of AQHA, are the co-owners of a filly foaled 13 March 1976. They applied to AQHA for registration of the filly as a quarter horse. After notice and a hearing in which their counsel and appellant Adams participated, registration was denied on the ground that the filly had white markings beyond the limits prescribed by AQHA's rules.

Appellants instituted this action in district court seeking a mandatory injunction compelling AQHA to register their filly. Following a court hearing sans jury, the relief requested by appellants was denied. The court made and filed findings of fact and conclusions of law. From its factual findings, the court concluded that there was no violation of due process and AQHA had acted in full conformity with its rules.

Appealing, appellants essentially complain that the court reversibly erred "in failing to find" that AQHA denied them due process and "in not finding" that AQHA's application of its rules unfairly discriminated against them in certain particulars. The specific complaints are suitably observed against the recorded background.

The American Quarter Horse Association is a non-profit Texas corporation which exists to collect, record and preserve the quarter horse pedigree. In this connection, AQHA regulates the breeding, exhibition, publicity, sale, racing and improvements of the breed; and, before a horse may participate in any AQHA sanctioned event, it must be duly registered as a quarter horse.

The business of AQHA is managed by a board of directors and an executive committee. The board of directors has the power to make, amend, repeal and enforce rules and regulations not contrary to law or to the by-laws. The by-laws and rules affecting registration of horses are subject to change only by the board.

The executive committee is vested with all powers of the board of directors, except the power to change any by-laws pertaining to registration of horses. The committee is given the specific authority to declare eligible for registration an animal lacking some of the registration rule requirements.[1]

From its inception, AQHA has had the so-called "White Rule," designed to protect the breed by excluding therefrom pinto, appaloosa, albino, or other characteristics deemed undesirable. At all times material to this cause, the rule, appearing as Rule 96 in AQHA's Official Handbook under the heading "HORSES NOT ELIGIBLE," contains in its first three of five sections the following language:

96. A. No animal having white markings with underlying light skin beyond the following described lines shall be eligible for registration in any section of the Association's official Stud Book. The prescribed lines for white markings with underlying light skin are as follows:

1. White above a line around each leg at the center of the knees and point of the hocks.

2. White behind a line running from the center of each ear to the corner of each side of the mouth; and

3. White on the lower lip above a line running from one corner of the mouth to the other corner. A diagram of these lines of demarcation is shown on page 30 [of AQHA's Official Handbook].

1. A broader view of the nature and functions of The American Quarter Horse Association, together with some aspects of the quarter horse industry, are recorded in *Hatley v. American Quarter Horse Association*, 552 F.2d 646 (5th Cir. 1977).

B. When an animal is a gelding or spayed mare, it may be eligible for registration, having white markings with underlying light skin beyond the lines described in paragraph "A" above, but not constituting excessive white markings with underlying light skin, or having one or more spots of such size, kind, and in such location as to indicate pinto, appaloosa or albino breeding. The registration application for such animal shall be accompanied by a statement from the owner stating such condition of the animal and the date on which the animal was gelded or spayed.

C. In cases of undue hardship, in addition to the provisions of paragraphs A and B above, the Executive Committee shall have the authority to declare eligible for registration a stallion or mare which, in the majority of opinion, is outstanding in conformation and having a sire or dam of outstanding performance or produce, and is worthy of registration though having white markings with underlying light skin beyond the lines described in paragraph A above, but within the standards specified in paragraph B above. An owner who feels he has a just hardship case shall make application and tender a fee of $250 for the purpose of sending two regular field inspectors to examine the horse. The $250 fee shall not be returned regardless of the decision of the Executive Committee. The inspectors' opinions shall be considered by the Executive Committee in acting on the application.[2]

Rule 96C is commonly referred to as the "hardship rule."

Appellants' application for registration of their 1976 filly was received by AQHA on 19 May 1976. A 30 August 1976 letter from AQHA's registration department informed appellants that a preliminary examination of the application and photographs filed indicated the possibility of white markings on the filly beyond the standards specified in Rule 96A. Appellants were advised they could personally appear and be represented by counsel to support the application when it was presented to the committee, or they could waive the right of hearing and instruct AQHA to process the application under Rules 96B or 96C. Appellants responded by waiving personal appearance, requesting that the application be considered under Rule 96C, and tendering a $250 check for the conformation inspection costs. Appellant Adams added a note that it would be satisfactory for the inspection to be delayed until the next spring. AQHA then reminded appellants of the need for closeup pictures where excessive white might exist on the filly, suggesting the areas and camera angles.

Before any further action was taken on the application, AQHA's Stud Book and Registration Committee, after soliciting and receiving input, reported to the general membership at AQHA's March, 1977 convention. The report included recommendations that no amendment be made to Rule 96, that greater leniency should be shown in registering spayed mares and geldings, and that registration of potential breeding stock under the hardship rule [Rule 96C] must be carefully regulated. The board of directors approved the report. The executive committee accepted the action as representing AQHA's interpretation of Rule 96.

Thereafter on 26 June 1977, the executive committee met and made a preliminary determination that the filly was not subject to registration because of the photographic indications of white markings unacceptable for registration under Rule 96C. Informed of this determination, appellants were also advised they would have an opportunity to appear before the committee for a final determination, be represented by counsel if they desired, and present any evidence in support of their application for registration.

Appellants requested a hearing through their attorney's letter, which further stated, "We would also appreciate receiving the

---

2. During the course of this action, the American Quarter Horse Association eliminated Rule 96C effective 1 January 1979.

following information prior to the hearing date," *viz.*, (1) the number of horses, with their names and the owners thereof, registered under Rule 96C during the past two years; (2) the names of the two field inspectors who looked at the filly with copies of their recommendations; (3) the produce and performance record of Decketta, the dam of their filly; and (4) any information AQHA has on Barlaris, the sire of their filly. AQHA scheduled a hearing and, furnishing the information requested in items 3 and 4, advised appellants that the information requested in items 1 and 2 would not be furnished.

At a 24 October 1977 hearing before the executive committee, Adams and counsel for appellants appeared, were given access to the inspector's report, and participated in the hearing. Some ten days later, appellants were notified of the determination that their filly was not eligible for registration under Rule 96C. This litigation ensued.

In denying the mandatory injunction sought by appellants, the trial court, in addition to finding most of the background facts just written, specifically found that: (6) Rule 96 is valid, its validity is unquestioned by appellants, and it is reasonable and necessary in furtherance of AQHA's goal to improve the quarter horse breed; (9) the executive committee has accepted the approved 1977 report, the adoption of which is properly in furtherance of a reasonable and necessary goal of AQHA, as a mandate with the result that in the registration process, the executive committee has dealt more leniently with spayed mares and geldings and more strictly with potential breeding stock, approving only five of some eighty hardship applications; (10) the refusal by AQHA to furnish appellants with the information requested in item 1 above was not unreasonable and did not handicap appellants in the proper presentation of their case, it being noted that there was no attempt by appellants to pursue the dis-

covery remedies available to them under Tex.R.Civ.P. 167 and 168;[3] (11) the Rule 96C provided inspection for conformation was not made, but this was not a factor in the refusal to register since, if it were determined that registration was permissible despite the excessive white, the conformation inspection would have been directed; and (12) the executive committee did not act arbitrarily or capriciously but acted in the proper performance of its duties, it being justified in using as its guide AQHA's construction of its own rule at the 1977 annual meeting, and, under the circumstances, appellants cannot complain of the delay in scheduling the hearing.

■ Complaining of the trial court's failure to find a denial of due process and unfair discrimination in the particulars later listed, appellants have not attacked the trial court's specific findings of fact from which the court concluded that there was no violation of due process and, in effect, no unfair discrimination which entitled appellants to the relief sought. Absent a contention that the evidence supporting a finding of fact is either insufficient or against the great weight of the credible evidence, this court has no jurisdiction to consider or determine those matters. *Darryl v. Ford Motor Company*, 440 S.W.2d 630, 633 (Tex. 1969). Consequently, the facts found by the trial court must govern, *B. F. & C. M. Davis Co. v. W. E. Callaghan Const. Co.*, 298 S.W. 273, 276 (Tex.Comm'n App.1927, holding approved), and are binding on the courts. *French Independent School Dist. v. Howth*, 134 Tex. 211, 134 S.W.2d 1036, 1037 (1940); *Curtis v. National Cash Register Co.*, 429 S.W.2d 909, 911 (Tex.Civ.App.— Amarillo 1968, writ ref'd n. r. e.).

■ Nevertheless, appellants first complain that the court erred in "failing to find" they were denied due process by AQHA's refusal of the information requested in items 1 and 2 above. They maintain

---

3. Tex.R.Civ.P. 167 is the authority for, and sets forth the procedure to obtain, the production of documents and things for inspection, copying or photographing; Tex.R.Civ.P. 168 is the au- thority for, and contains the procedure to compel answers to, interrogatories addressed to the opposing party.

that this information was necessary for them to prepare for the October, 1977 hearing and, without it, they were denied the due process opportunity to be heard in a meaningful manner. Their argument is that if they had been able to show that other horses had been registered with more white, the executive committee would have no choice but to register their filly.

The basis for the complaint crumbles under the force of the trial court's unchallenged factual finding no. 10 respecting the item 1 information, and the undisputed evidence that at the hearing appellants were given access to the information designated in item 2. Unchallenged, finding no. 10 establishes, contrary to appellants' position, that AQHA's refusal to furnish the item 1 information was not unreasonable and did not handicap appellants in the presentation of their case. Appellants do not even argue that earlier access to the item 2 information would have beneficially affected their presentation at the hearing.

■ However, accepting the complaint itself for the proposition that denial of due process was established by the record as a matter of law, further inquiry is necessary. Although bound by unchallenged findings of fact, an appellate court is not bound by incorrect conclusions of law drawn therefrom. *Mercedes Dusting Service, Inc. v. Evans,* 353 S.W.2d 894, 896 (Tex.Civ.App.— San Antonio 1962, no writ). *Accord, Stahl Petroleum Co. v. Phillips Petroleum Co.,* 550 S.W.2d 360, 368 (Tex.Civ.App.—Amarillo 1977), *aff'd sub nom., Phillips Petroleum Co. v. Stahl Petroleum Co.,* 569 S.W.2d 480 (Tex.1978). Thus, given the established facts, the inquiry is whether controlling law produces the legal conclusion that there was a denial of due process in AQHA's failure to furnish the item 1 information, and not the court's conclusion that there was no violation of due process.

■ State action due process standards are inapplicable to the analysis of due process by voluntary associations, *Hatley v. American Quarter Horse Association,* 552 F.2d 646, 656 (5th Cir. 1977), because voluntary associations are free from judicial intervention so long as the governing bodies heed the bounds of reason, common sense and fairness and do not violate public policy or the law. *Brotherhood of Railroad Trainmen v. Price,* 108 S.W.2d 239, 241 (Tex.Civ. App.—Galveston 1937, writ dism'd). And yet, Texas courts have developed the principle that every tribunal which has the power and authority to adjudicate matters involving legal questions are bound by the traditional notions of due process. *Masonic Grand Chap. of Order of East. Star v. Sweatt,* 329 S.W.2d 334, 337 (Tex.Civ.App. —Fort Worth 1959, writ ref'd n. r. e.). In this connection, a construction of Texas law has led to the specific holding that due process principles are applicable to the exercise of discretion by AQHA's executive committee in the registration process. *Hatley v. American Quarter Horse Association, supra,* at 657.

■ The essential elements of due process applicable here are notice and an opportunity to be heard and to defend in an orderly proceeding adapted to the nature of the case. *Masonic Grand Chap. of Order of East. Star v. Sweatt, supra,* at 337. Because the by-laws of AQHA do not cover this subject, appellants were entitled to a fair hearing after due notice by procedure analogous to judicial proceedings. *Sweatt, supra,* at 337; *Hatley, supra,* at 657.

There is no question that appellants received adequate notice of the October, 1977 hearing to finally determine the registration issue. The point of inquiry, then, becomes whether the hearing, when reviewed against judicial proceedings, was fair in the absence of the information that appellants say was necessary for them to prepare for the hearing and to be heard in a meaningful manner.

■ In the normal course of judicial proceedings, one party may compel his opponent to produce documents, writings and other things in the opponent's control which are necessary for the proper prosecution or defense of a cause of action. Tex.R.Civ.P. 167. The production, however, is not an absolute right. The movant must show

good cause therefor and that the items sought constitute, or contain, or are reasonably calculated to lead to the discovery of, evidence material to any matter involved in the action. The trial court determines, within its discretion, if good cause and materiality exist. Sufficient facts must be pleaded and proved so that the court may see the need as well as the materiality of the items sought. It is not enough to simply ask for the items. *Irwin v. Basham,* 507 S.W.2d 621, 626 (Tex.Civ.App.—Dallas 1974, writ ref'd n. r. e.).

■ In the case at bar, appellants merely stated to AQHA that "We would also appreciate receiving the . . . information." They gave no reason why they asked for the information. Appellants do not contend that, even after they were advised the information they now insist was necessary would not be furnished, they pursued the matter further. They do not suggest that they asked for additional time either to prepare for, or to secure the production of the missing information necessary to make, an adequate presentation for registration of their filly.

As a part of factual finding no. 10, the trial court noted that there was no attempt by appellants to pursue the discovery proceedings available to them under Tex.R. Civ.P. 167 and 168. And, thus, appellants' mere approach to AQHA for the information would be insufficient in an analogous Texas court proceeding to compel AQHA to produce the information. *Irwin v. Basham, supra,* at 626. Under the recorded circumstances, the final hearing without the production of the information cannot be said to be, as a matter of law, so unfair as to constitute a denial of the due process opportunity to be heard in an orderly proceeding.

Secondly, appellants lodge the complaint that they were denied due process by not being notified of the 26 June 1977 executive committee meeting at which their application for registration under Rule 96C was first considered. Collateral to the complaint is the statement that appellants were not given the opportunity to be present at the meeting, tacitly submitting that they

were entitled to a hearing at that preliminary meeting.

■ This complaint has been raised for the first time on appeal. The matter was not mentioned in appellants' pleadings, in the trial court's findings of fact or conclusions of law, or even in appellants' request for additional findings of fact and conclusions of law. Matters not presented at trial and raised for the first time on appeal will not be considered by the reviewing court. *Brunson v. Brunson,* 372 S.W.2d 761, 764 (Tex.Civ.App.—Amarillo 1963, no writ).

■ Beyond that, the June, 1977 meeting was but one of a series of steps in processing the application for registration prior to the final hearing at which appellants, with adequate notice, participated. The demands of due process do not require a hearing at any intermediate step of the proceeding so long as the requisite hearing is held before the final determination becomes effective. *Opp Cotton Mills, Inc. v. Administrator,* 312 U.S. 126, 152–53, 61 S.Ct. 524, 535–36, 85 L.Ed. 624, 640 (1941). *A fortiori,* notice of the preliminary meeting was not a due process requirement.

Thirdly, appellants charge the trial court with error "in failing to find" that AQHA's 1977 "change of registration requirements under Rule 96C could not be applied to" appellants' filly. This charge of a failure to find is antagonistic to the court's unchallenged factual findings nos. 6, 9 and 12 which, in substance, are that the executive committee acted properly and with justification, and not arbitrarily or capriciously, in following AQHA's 1977 construction of the valid Rule 96 in refusing registration. In view of the previously declared effect of unchallenged factual findings, the charge is not sustainable.

■ Still, appellants, while acknowledging that the 1977 interpretation of Rule 96C was not intended to change the published rule, ignore the trial court's factual findings to present their perception of AQHA's refusal of registration to be the result of the retroactive application of a *new* rule. This action, appellants argue on the

strength of the general principle which prohibits the retroactive application of a rule by public administrative agencies, operated to their prejudice. The principle, and cited authorities considering its application to public administrative agency actions, are inapposite to the situation developed here where it is clearly established that a private, voluntary association presently applied a previously adopted *interpretation* of its own rules. It remains the right of a voluntary association to make and adopt laws and regulations and to interpret them, and a member, by becoming such, subjects himself, within legal limits, to the organization's power to administer as well as make its rules. *Combs v. Texas State Tchrs. Ass'n*, 533 S.W.2d 911, 913 (Tex.Civ.App.— Austin 1976, writ ref'd n. r. e.). Long has it been the law of this state that courts will not interfere with this right of internal management so long as the governing body does not substitute legislation for interpretation, overstep the bounds of reason, common sense, or fairness, or contravene public policy or the laws of the land in its interpretation and administration. *Combs, supra,* at 913; *Brotherhood of Railroad Trainmen v. Price,* 108 S.W.2d 239, 241 (Tex.Civ.App. —Galveston 1937, writ dism'd).

This law furnishes the test for appellants' contention that the 1977 interpretation of Rule 96C could not be applied to determine registration requirements for their filly. They argue that because their application was filed in 1976 before the rule interpretations were adopted in 1977, the more lenient pre-interpretation standards must apply. And they note a testimonial indication that the filly might have been approved for registration prior to the adoption of the rule interpretation.

The evidence is, however, that the determinative date for a Rule 96C hardship registration decision is neither the date the application is received nor the time the excessive white problem is first noticed; rather, the determinative date is when the executive committee meets to exercise its discretion by virtue of and pursuant to the very wording of Rule 96C to accept the excessive white markings—or, inferentially, to defer the question pending a final hearing.[4] Appellants invited delay in the determination of the merits of their application. The court found that appellants cannot complain of the delay of the hearing at which the executive committee acted properly under, and in conformity with, the association's construction of its own rules. As members, appellants are bound by the interpretation, and the fixed facts refute the charge of error.

The remainder of appellant's argument concerning the charge of error is interrelated with, and it will be considered in addressing, their last complaint. This complaint is that the court erred in "not finding" appellants had been unfairly discriminated against because AQHA had registered other 1976 fillies having more excessive white than their filly. This complaint, too, runs afoul of, and must yield to, the court's unchallenged finding of fact no. 12; but the claim of a right denied will be noticed.

The interrelated argument is for a right of registration since three animals having more excessive white than appellants' filly had been registered under Rule 96C after the 1977 interpretation was adopted. Of the three animals, two were mares, one foaled in 1975 and the other foaled in 1976, whose excessive white markings were accepted by the executive committee as early as December, 1976; and the other was a 1976 horse whose excessive white markings were accepted after the 1977 rule interpretation. All three animals were formally approved for registration after the 1977 rule interpretation had been adopted.

---

4. When the excessive white markings are accepted by the executive committee, the horse is approved for conformation inspection; but formal approval for registration is not given until the inspection shows the horse has proper conformation and the excessive white is still found to be acceptable. Agreeable to the court's find-

ing of fact no. 11, the testimony was that if at a full hearing after a preliminary determination of excessive white markings, the executive committee decides the excessive white is acceptable, there would be no problem in proceeding with the conformation inspection.

AQHA has the right to promote its declared purpose and advance the best interests of its members. *Cline v. Insurance Exchange of Houston,* 140 Tex. 175, 166 S.W.2d 677, 680 (1942). As stated in AQHA's by-laws, a part of its purpose is to preserve the pedigree of the quarter horse by regulating the breeding and improvement of the breed. To this end, no absolute right of registration exists for any animal having white markings, with underlying light skin, beyond the prescribed lines; indeed, the right of registration is denied unless a majority of the executive committee, in the exercise of discretion, determines that the animal is otherwise worthy of registration. Whether the policy is wise is no concern of the courts unless the committee has acted contrary to law or has been unfair in its determination. *Mid-West Elec. Coop. v. West Texas Chamber of Com.,* 369 S.W.2d 842, 844 (Tex.Civ.App.—Waco 1963, no writ).

In the light of what has been written, the discretionary acceptance of the excessive white markings on the two mares under the criteria followed prior to the 1977 interpretation of Rule 96C becomes immaterial to a post-interpretation action claimed to constitute unfair discrimination. The question, rather, is whether, under the post-interpretation of Rule 96C, the refusal to accept the excessive white markings on appellants' filly conclusively shows an unfair determination in view of the acceptance of the excessive white markings on the other horse.

Without particularizing the different white markings on the two animals, it suffices to state that a careful review of the evidence reveals that the horse has less white markings, which appellants concede but limit the concession to a possible difference of one-fourth inch. It is, of course, these very circumstances which invoke the entrusted discretion of the executive committee in the registration process, for, as appellants state, "it is clear that each horse must be registered on its own merits." And, thus, it cannot be said as a matter of law that the exercise of discretion to reach opposite results concerning two animals differently marked established unfair discrimination against appellants.

Each facet of appellants' complaints has been considered and, under this record, reversible error is not presented by them. Accordingly, appellants' points of error are overruled.

The judgment of the trial court is affirmed.

## ON MOTION FOR REHEARING

A position advanced in appellants' motion for rehearing requires additional comment. Appellants view our opinion as holding that the discovery procedures provided under Tex.R.Civ.P. 167 and 168, which by their language are applicable to judicial proceedings, were available and should have been utilized by them for the October, 1977 hearing before AQHA's executive committee. We did not so hold.

Perhaps, as we discussed the parallelism of administrative hearings and judicial proceedings, we should have more clearly stated that all comments concerning Rules 167 and 168 were referenced only to their application to judicial proceedings. Nevertheless, our discussion of the rules was in relation to judicial proceedings to illustrate, by analogy, that something more than a mere request for unfurnished information is necessary to show that an administrative hearing held without the production of that information was unfair. Our holding, following the declaration that appellants were entitled to a fair hearing before the executive committee after due notice by procedures analogous to judicial proceedings, was that the hearing before the executive committee in the absence of information merely requested, without more, cannot be said, as a matter of law, to be violative of due process.

The motion for rehearing is overruled.

COUNTISS, J., not participating.